IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Sharon Harris, as Special | ) | |
| Administrator of the Estate of | ) | |
| Andre Lepinay, deceased, | ) | |
| | ) | No. 16-10695 |
| *Plaintiff,* | ) | |
| | ) | |
| -*vs*- | ) | *(Judge Feinerman)* |
| | ) | |
| City of Chicago, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S MOTION FOR PRE-TRIAL DETERMINATION OF THE ADMISSIBILITY OF THE STATEMENT OF PLAINTIFF'S DECEDENT TO THE INDEPENDENT POLICE REVIEW AUTHORITY

Plaintiff, by counsel, moves the Court to rule in advance of trial that the sworn statement made by plaintiff's decedent to an investigator employed by defendant City of Chicago, which was made before plaintiff's decedent retained counsel to file this lawsuit, is admissible under Federal Rule of Evidence 807, the Residual Hearsay Exception.

### I.   Introduction

Plaintiff's decedent was present at his home on the South Side of Chicago on October 21, 2016 when nine Chicago police officers, defendants in this case, executed a search warrant. Plaintiff's complaint alleges that "one or more of the defendant officers used excessive force against

[plaintiff's decedent], and the other officers each failed to intervene to prevent the violation of [plaintiff's decedent's] rights." (Complaint, ECF No. 1, ¶ 15.) Defendants deny that any officer used excessive force against plaintiff's decedent. (Answer, ECF No. 19, ¶ 15.)

Plaintiff's decedent promptly filed this action, but he succumbed to his final illness before he could be deposed. The Court appointed plaintiff, Mr. Lepinay's niece, to serve as special administrator on June 29, 2017. (ECF No. 27.)

Plaintiff's decedent gave a sworn statement to the Independent Police Review Authority ("IPRA") on October 28, 2016, just one week after the alleged excessive force. The IPRA investigators made an audio recording of the interview. Plaintiff will submit a copy of the audio recording on digital media as Exhibit 4 and attaches a transcript of the recording as Exhibit 1.[1] Plaintiff's decedent signed a document, attached as Exhibit 2, stating that he freely and voluntarily consented to the recording. Plaintiff's decedent also completed a sworn affidavit, attached as Exhibit 3, stating:

> I, Andre Lepinay, have given an electronically recorded statement related to the above-referenced incident. I swear or affirm, under penalties provided by law, that the information contained in the above and/or attached statement summary, or

---

[1] Plaintiff submits the transcript for the convenience of the Court. As stated in Seventh Circuit Pattern Criminal Instruction 3.14, "The recording is the evidence of what was said and who said it. The transcript is not evidence."

the attached electronically recorded statement, is true and accurate.

Plaintiff does not have any evidence to support her claim other than the recorded sworn statement of plaintiff's decedent. The parties disagree about the admissibility of the statement but agree that the Court should decide this evidentiary question as a threshold matter.

## II.   The Statement is Admissible

Plaintiff seeks admission of the statement of plaintiff's decedent under Federal Rule of Evidence 807, the Residual Hearsay Exception:

> (a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
>> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>>
>> (2) it is offered as evidence of a material fact;
>>
>> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>>
>> (4) admitting it will best serve the purposes of these rules and the interests of justice.
>
> (b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

F ED R. E VID. 807.

This rule sets out five factors that guide determination of admissibility. *United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016).

The second and fifth elements of this five-factor test are not disputed. First, whether the defendant officers used excessive force is a material fact as required by Rule 807(a)(2). Second, this motion, filed before the close of discovery, satisfies the notice requirement of Rule 807(b).

This case also satisfies the third element, because the sworn statement plaintiff's decedent gave to IPRA is more probative about plaintiff's allegations than any other evidence that plaintiff can obtain through reasonable efforts. Three other persons were present in the apartment when the officers executed the warrant. (Exhibit 1 at 13-14.) Counsel has been unable to locate any of these persons; while plaintiff's decedent stated in his sworn IPRA statement that some of these people claimed to have witnessed "the physical contact," plaintiff's decedent stated that none was present in the room with him for the entire encounter. (*Id.* at 13-14.)

Plaintiff's decedent told the IPRA investigators that immediately upon entry into the dwelling, three officers "bum rushed" him and an officer carrying an assault rifle "jabbed me in the stomach." (Exhibit 1 at 2, 5.) The

-4-

officers took plaintiff's decedent to the floor and one officer kneed plaintiff's decedent in the back. (*Id.* at 10.) After this use of allegedly unreasonable force, an officer removed a woman from the front bedroom (*Id.* at 3), and then brought two other persons from the back bedroom. (*Id.*) None of these witnesses could have observed the use of force that plaintiff testified he suffered when the officers first entered the dwelling. Because there is no other witness who can testify in support of plaintiff's allegations, the statement of plaintiff's decedent is more probative than any other evidence that plaintiff can obtain through reasonable efforts.

There are two other factors: whether the statement has equivalent circumstantial guarantees of trustworthiness, Rule 807(a)(1), and whether admitting the statement will best serve the purposes of the Rules of Evidence and the interests of justice, Rule 807(a)(4).

The Seventh Circuit has identified several factors to be considered when evaluating the trustworthiness of a statement under Rule 807(a)(1). These factors include "(1) the probable motivation of the declarant in making the statement; (2) the circumstances under which it was made; and (3) the knowledge and qualifications of the declarant." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999) (quoting *Cook v. Hoppin*, 783 F.2d 684,

690–91 (7th Cir. 1986) (internal quotation marks omitted)). The Court has also provided the following list of factors:

> the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify before the grand jury; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability.

*United States v. Moore*, 824 F.3d 620, 622-23 (7th Cir. 2016) (quoting *United States v. Snyder*, 872 F.2d 1351, 1355-56 (7th Cir. 1989)). This list is "neither exhaustive nor absolute." *Id.* at 623 (quoting *United States v. Doerr*, 886 F.2d 944, 956 (7th Cir. 1989)).

The Court should conclude that the statement of plaintiff's decedent is admissible. First, plaintiff's decedent made his statement under oath, signing a "sworn affidavit-electronically recorded statement." (Exhibit 3.) In Cook County, the threat of prosecution for perjury is a real one. *See* Jason Meisner, *Shooting Victim Who Recanted Testimony Charged with Perjury*, CHI. TRIB. (Sept. 3, 2011), available at http://articles.chicagotribune.com/ 2011-09-03/news/ct-met-recant-perjury-charge-20110903_1_perjury- charges-gang-member-testimony. As in *United States v. Doerr*, 886 F.2d 944 (7th Cir. 1989), one factor supporting admissibility is that the statement of

plaintiff's decedent was "given under oath and subject to a penalty for perjury." *Id.* at 956.

Also, as in *Doerr*, 866 F.2d at 956, plaintiff's decedent did not have any incentive to manufacture false testimony; he had not retained counsel to bring a lawsuit when he made his statement. Moreover, as appears in the IPRA statement at 2, plaintiff's decedent knew that he had advanced cancer, and that he had left the hospital and "came home to die." (Exhibit 1 at 9.) Thus, there is no reason to believe that the motivation of plaintiff's decedent in making the statement was anything other than to speak out truthfully about police misconduct.

When the Court considers the circumstances surrounding the statement, it should weigh that the IPRA statement was taken by an employee of defendant City of Chicago. Plaintiff does not contend that the investigator's questions were equivalent to cross examination, but the City's role in creating the statement should not be overlooked.

Other factors that weigh in favor of finding equivalent circumstantial guarantees of trustworthiness are that the statement of plaintiff's decedent was voluntary. He initiated the IPRA investigation and was under no compulsion to give the statement. He made the statement on his personal knowledge. And far from recanting the statement, he followed it by

retaining counsel and filing a lawsuit with allegations consistent with the statement.

In addition, the two investigators who were present for the statement can testify to the demeanor of plaintiff's decedent. And the audio recording will also provide the jury with a sufficient opportunity to assess the statement. Plaintiff seeks only to admit the statement; whether to believe the statement or the testimony of the defendants will be left to the jury.

The truthfulness of plaintiff's decedent about his possession of illegal drugs is one of the most significant factors showing that his statement was trustworthy. (Exhibit 1 at 5.) In addition, plaintiff admitted that he did not immediately remove his hands from his pockets when the officers ordered him to remove them. (Exhibit 1 at 9.) As in *Doerr*, the statement therefore has "the circumstantial guarantee of trustworthiness supporting the hearsay exception for statements against interest." *Doerr*, 886 F.2d at 956 (citing FED. R. EVID. 804(b)(3).)

Finally, admitting the statement will best serve the purposes of the Federal Rules of Evidence and the interests of justice. The "end of ascertaining the truth and securing a just result," FED. R. EVID. 102, would be ill-served by submitting plaintiff's case without the only evidence that supports it. "Admission of the evidence will best serve the interests of

justice by increasing the likelihood that the jury will ascertain the truth."
*Huff v. White Motor Corp.*, 609 F.2d 286, 295 (7th Cir. 1979)

This Court should follow courts that have admitted similar statements under the Residual Hearsay Exception. *United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) (phone number provided to probation officer admissible; most important factor was lack of motivation to lie about number); *United States v. Dumeisi*, 424 F.3d 566, 577 (7th Cir. 2005) (foreign intelligence documents admissible); *United States v. Sanchez-Lima*, 161 F.3d 545, 547 (9th Cir. 1998) (sworn videotaped statements of witnesses deported to Mexico admissible); *Huff v. White Motor Corp.*, 609 F.2d 286, 295 (7th Cir. 1979) (statements made by plaintiff's deceased husband regarding the car accident that gave rise to the suit admissible; among other factors, the statement was contrary to the husband's pecuniary interest); *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1094 (N.D. Ill. 2015) (emails sent through military chain of command as part of governmental investigation admissible).

### III.    Conclusion

For all these reasons, the Court should rule that the statement of plaintiff's decedent is admissible.

Respectfully submitted,

/s/   Joel A. Flaxman
Joel A. Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
200 S Michigan Ave Ste 201
Chicago, IL 60604-2430
(312) 427-3200
*Attorneys for Plaintiff*

**Exhibit 1**

## Transcript of October 28, 2016 Interview of Andre Lepinay

| | |
|---|---|
| Hill: | Good morning, this is the audio recorded statement of Mr. Andre Lepinay relative to log number 1082761. This statement is currently being taken in an IPRA vehicle in front of Mr. Lepinay's residence at 7428 South Coles. Today is October 28th, 2016. It's approximately 11:25 a.m. Also conducting the statement with me. I'm sorry, my name is investigator Chantel Hill, C-H-A-N-T-E-L-L-E. Last name H-I-L-L. Also conducting the statement is Mr. Neal. Mr. Neal, can please state your name and spell it for the record. |
| Neal: | Investigator Wilbert Neal, W-I-L-B-E-R-T N-E-A-L. Badge number 131 |
| Hill: | OK, also my badge number is 172. Mr. Lepinay, can you please state your name and spell it for the record? |
| Lepinay: | OK, my name is Andre Lepinay. A-N-D-R-E L-E-P-I-N-A-Y |
| Hill: | OK, Mr. Lepinay, can you provide your street address for me? |
| Lepinay: | 7428 South Coles. |
| Hill: | OK, and you have a phone number? |
| Lepinay: | Yes, I do. 773-297-4427. |
| Hill: | OK, and your date of birth? |
| Lepinay: | 6/13/55. |
| Hill: | OK, and is there an alternative way reach you if we can't reach you at the information given? |
| Lepinay: | At this number, my wife's number. |
| Hill: | Do you know it by heart? |
| Lepinay: | Yeah, I know her number by heart. . . 773-828-1426. |
| Hill: | OK, can you provide it? |
| Lepinay: | It's 773-828-1426. |
| Hill: | And her name? |
| Lepinay: | Her name is Gail Teresa Mimms Lepinay. |
| Hill: | Her first name is Gail? |
| Lepinay: | G-A-I-L. |
| Hill: | OK. Teresa Mimms. M-I-M-S? |
| Lepinay: | M-I-M-M-S. |

-1-

eximia

| | |
|---|---|
| Hill: | OK. Lepinay? |
| Lepinay: | Lepinay. L-E-P-I-N-A-Y |
| Hill: | Alright, Mr. Lepinay, we are here today because you initiated a complaint relative to a search warrant that was executed on October 21st of 2016, correct? |
| Lepinay: | Yes, m'am. |
| Hill: | OK, and you made several allegations regarding interactions with the police officers who were executed the warrant. OK? |
| Lepinay: | Yes, m'am. |
| Hill: | OK. So can you please provide me with a detailed account of what occurred? |
| Lepinay: | OK. I heard a knock at the door. Like that guy standing right there at my door. I heard a knock at my door, like that guy is looking for me. OK and I open my inside door, the steel door, and guys rushed in. Like one guy hollered "Don't move. Don't move." Other guys hollered "Get your hands of your pocket." Then the other guy came in he jabbed me in the stomach with, I guess a rifle, the assault weapon. He jabbed me in the stomach.<br><br>I had just come home from the hospital. I've been here four minutes and I just got home from the hospital and it hurted. And I found out that Saturday before this happened, way before it happened, that I had cancer in my liver on stage 3 cancer in my liver.<br><br>OK, and when he jabbed me it hurted. And then I went to the ground, right. And then the officers – my hands are still in my pocket and I'm, not doing it. I'm trying to get my hands out of my pocket. This one officer, on my left side, he jumped up and put his knees in my back and while he was doing that I'm laying like this here and the other officer on this side, he's hitting me in my face, talking about: "Get your hands out of pocket. Get your hands out of your pocket."<br><br>I'm laying on stomach. I can't move, and then, this goddamn, with the [unintelligible], he kneed me again. He kneed me about two more times and then he finally let me get my hands out my pocket.<br><br>When I got my hands my pocket, what I had in my hand fell out. If he would have let me move my hand at first he would have seen that |

|  | I can't make a fist with my hand. Because I got two broke fingers. He'd have seen that. And I had something in my hand at the time.<br><br>And then he put this hand behind my back and the other guys talking about, "Stop wrestling with me." He went to hit me again. "Stop wrestling with me" with this hand. Talking about how I was wrestling with him, but I was handcuffed on the left hand side and then when he finally let my hand come out and I had something in this hand and then I put it behind my back and they cuffed me, OK, and that's what happened. They had jumped on me like that, OK and then they went to continue on serving the warrant.<br><br>And they went in the front bedroom and got that lady out and went to my room, which was nobody was in there and went to the back bedroom where two people were, right, and then they brought them out.<br><br>They had seen them jumping on me as they was bringing them out. Yeah I guess, I really couldn't see what was going on, because I had a fist, steady, I'm laying on the floor like this. Like I'm looking at you. I really couldn't see with a fist coming down. That's all I really could see so I might be wrong about the way the people came out, but they told me they saw everything that happened the day as I steady getting beat upon. You know what I'm saying? |
| Hill: | So they continued to search? |
| Lepinay: | They finally got to … I seen them coming out the front bedroom. I seen officers coming out the front bedroom. |
| Hill | Are you still on ground? Or are you up now? |
| Lepinay: | I'm up, he got me on the … my butt … |
| Hill: | But you're still sitting on the floor? |
| Lepinay: | Sitting on the floor. They're trying to get me up, trying to bend this leg up so I can stand up because I can't bend this knee that good because I got hit by a car July 1st and I really just got these braces off of me. |
| Hill: | So they assisted you up? |
| Lepinay: | They assisted me up. |
| Hill: | And where did you go from there? |

**Plaintiff's Exhibit 1**                                                    **Page 3**

| | |
|---|---|
| Lepinay: | They sent me down, I think they set me down on the couch over here. |
| Hill: | And they continued on searching? |
| Lepinay: | They continued on. I am steady telling them, If you look in the bag on table, clear plastic bag that had all my papers in it and my prescriptions in it that I'm supposed to get from the pharmacy, but I didn't have the money to get it. Because I was just coming home from the hospital and my blue and white card didn't carry everything. |
| Hill: | So they continued to search? |
| Lepinay: | Uh hum. |
| Hill: | You and I'm, assuming the other, the two witnesses that were there. They were all in the same room, while they are searching the house, while the officers were searching the house? |
| Lepinay: | You can say in the same room, because I'm on the couch. When I get get up to see where they were, they was sitting in the chairs by the dining room table. |
| Hill: | The dining room and the living room are connected, right? |
| Lepinay: | Right. |
| Hill: | It's like one big room? Right? |
| Lepinay: | Right, right. |
| Hill: | OK, so they're all there. They searched the house and then? How did they come to leave? |
| Lepinay: | The officers? |
| Hill: | Yes. |
| Lepinay: | OK. They searched everything and they brought, they had a dog with him and they brought the dog in and the dog didn't find anything and there wasn't no money in the house. It wasn't no sense for them staying there anymore, because there was nothing in there for them to get, and we, I kept telling them the man, there ain't nothing in here like that, there ain't nothing in here like that. |
| Hill: | Did they ever go over the warrant with you? |
| Lepinay: | Not until they were leaving. |

**Plaintiff's Exhibit 1**                                            **Page 4**

| | |
|---|---|
| Hill: | Did they ever provide it? |
| Lepinay: | … they gave me a warrant when they first came in. But they bum rushed me. I couldn't get a chance to read it. They stuck it and boom |
| Hill: | Did they ever asked you about the contents of whatever they were looking for? Or who they were looking for in that house. |
| Lepinay: | No. The warrant wasn't even in my name until way later. There is a guy named James. The guy that stayed in the front room, front bedroom named James Davis. |
| Hill: | OK. So you learned of this after they left? When you had an opportunity to review the warrant? |
| Lepinay: | Right. Right. Right. |
| Hill: | But you stated they didn't, that you know of, they didn't find anything in the house? |
| Lepinay: | They didn't find anything. They found something that I had in my left hand and something in my right hand. They found that. |
| Hill: | What was something? |
| Lepinay: | OK, then I'll be getting to that part. What was, in my left hand, a guy gave a bag of blow because I couldn't get my pain pills for my stomach. So he gave me a bag of something and that's what was in that one bag. And a straw was in the other hand.<br><br>OK, and they didn't write it up, because that wasn't what they were there for. |
| Hill: | So at that time they found one bag of controlled substance on you but you were not arrested, correct? |
| Lepinay: | Right. |
| Hill: | OK. Did they ask you about it at all? |
| Lepinay: | No, they didn't ask me no more about it … they took it … They took it. Because at the time I was in there, they still hadn't look through my papers.<br><br>My nurse pulled up to make sure that I got home because that Tuesday, I was supposed to start chemo that Tuesday OK, but I didn't have to start chemo that Tuesday. I think he was the nutritionist. I go to see him next Tuesday. |

| | |
|---|---|
| Hill: | OK, so I will start you back to the front, to the beginning. So you said you had just come from the hospital. |
| Lepinay: | Just walked in the door. In there four minutes. |
| Hill: | And you were coming from what hospital? |
| Lepinay: | Jackson Park Hospital. |
| Hill: | So how did you arrive to the home from Jackson Park? |
| Lepinay: | Caught the bus. |
| Hill: | OK. So you caught the bus and you walked to your residence. Now, when you, when you first walked up, did you see the police outside at all? You see any police activity? At all? |
| Lepinay: | No. I just seen the guy that did that for me. |
| Hill: | OK. So you walk through your front door, go inside and almost immediately you say you hear a knock at the front door? |
| Lepinay: | Right. We were talking. The lady was happy to see me. |
| Hill: | But you were inside your house? |
| Lepinay: | Inside the house. |
| Hill: | So you have an outside door into a hallway and there are two more doors which goes to the residence of first floor and the second floor right. OK. So what door did the police knock? |
| Lepinay: | The first floor door. |
| Hill: | So they had gotten into the hallway? |
| Lepinay: | Yes. And how they got in there I do not know. |
| Hill: | OK. But is the door usually locked or unlocked? |
| Lepinay: | Usually locked. |
| Hill: | The outside porch door? |
| Lepinay: | Yes. It's usually locked. |
| Hill: | But the door was not breached, it doesn't appear to be breached. Was the door breached by being kicked in? |
| Lepinay: | No. It was closed in. |

**Plaintiff's Exhibit 1**                                                    **Page 6**

| | |
|---|---|
| Hill: | OK. So no damage to the door. So you open your residence door and, as soon as you open the door, an officer pushed in with the document, which is, you confirmed later was the search warrant, so he kind of like shoved it at you and at the same time pushing his way through. |
| Lepinay: | Right, and I'm getting bum rushed. |
| Hill: | How many officers did that? One? Initially? I understand they all eventually came in. Is it just one officer? |
| Lepinay: | I can say it was three. Because one got on this side, another one … and the other one … jabbed me in the stomach. |
| Hill: | Do you recall, can you provide a description of the first officer you saw that passed, that bum rushed you, and shoved the warrant … |
| Lepinay: | No. The first officer I couldn't describe him. The only officer I can really describe was the guy with the rifle. |
| Hill: | OK, but he's not the one the one, the first officer … |
| Lepinay: | No, cause he was was standing in the front. |
| Hill: | OK, but you don't know if it was a white, black, Hispanic -- the first, the first officer that came through |
| Lepinay: | He looked like he was Hispanic, but he talked like a white boy. So … |
| Hill: | OK. So all of these officers are in plain clothes, like civilian clothes |
| Lepinay: | Right. Right. |
| Hill: | But they have … |
| Lepinay: | a jacket with the CPD … |
| Hill: | So you said the first initial contact with a officer I understand pushing through but the second, now an officer struck you in the stomach? |
| Lepinay: | Yeah, with the barrel of the rifle. I'm not sure if it was the second or the third, but he struck me in the stomach. Hit me in the stomach. |
| Hill: | And you're sure it was a rifle? |
| Lepinay: | I'm very sure. |
| Hill: | It was a gun. It was an assault … |
| Lepinay: | It was an assault … I'm very sure of that. |

-7-

| | |
|---|---|
| Hill: | OK, so it was a rifle. Can you describe it? |
| Lepinay: | Yeah. It was an automatic, with the magazine on it, but no butt. He had like a steel thing like the butt where you put up in your arm. And he had a sight on it. Like you see 'em on TV. |
| Hill: | What do you mean, a sight? Like a ... |
| Lepinay: | A scope. |
| Hill: | A scope? |
| Lepinay: | Yeah. |
| Hill: | Did it did have a strap on it too? |
| Lepinay: | I thought it was just hanging on with Velcro, but it might have a strap to it too. Because he had it like this here after he got me off the floor. |
| Hill: | When you say he had it like this, you have like the rifle is pointed down ... |
| Lepinay: | Down. To the floor. |
| Hill: | Down to the floor now. But this is after he struck you? |
| Lepinay: | Way after he struck me. |
| Hill: | What part of the rifle did he strike you with? |
| Lepinay: | The barrel. The muzzle. The barrel. |
| Hill: | The front of the rifle. |
| Lepinay: | Right. |
| Hill: | OK. And so ... how did that occur? Like, Did he ... Did the officer, I guess, I understand you said it's close to his chest. So did he lift it up, or he ... |
| Lepinay: | At that time it wasn't like that. When he came in ... |
| Hill: | When he came, was it pointed? |
| Lepinay: | It was like this. Coming in. |
| Hill: | Well, we are on an audio recorder.<br>It was pointed at you? |
| Lepinay: | It was pointed. Yeah. At me. Yeah. |

**Plaintiff's Exhibit 1** **Page 8**

| | |
|---|---|
| Hill: | And then he hit you with … |
| Lepinay: | Right. |
| Hill: | He hit you with the front end? |
| Lepinay: | Right. He kept saying, um, how'd it go? "I told you to get your hands out of your pocket. Get your hands out of your pocket. I could have shot you." And I said "I got stage 3 cancer man. I came home to die. I haven't started chemo yet and I came home to die." |
| Hill: | So when that occurred … are you OK? You need a minute? So when, when the officer came in, and you did say that you had your hands in pocket, how many times had they asked you to get your hands out of your pockets before they struck you? |
| Lepinay: | I don't know. I couldn't tell you the number of times. |
| Hill: | But was it multiple times? |
| Lepinay: | Multiple. It was more than one. More than two. |
| Hill: | And you didn't move fast enough? |
| Lepinay: | Basically. They steady pushing me. If they would have let me go… |
| Hill: | They had your arms at that time … but your arms were still locked into your … What were you wearing? A sweat shirt. The sweat shirt you have on today. |
| Lepinay: | It's the same one. |
| Hill: | And the front of the sweatshirt is just like one big pocket in your hands are inside that one big pocket. OK, so the officer strikes you. What officer did that? |
| Lepinay: | The one with the rifle. |
| Hill: | Can you give a description? A physical description? |
| Lepinay: | I can describe him. Reddish hair. White. With like a mingle beard. Glasses |
| Hill: | What do you mean by mingle beard? |
| Lepinay: | It was, you know, like salt and pepper. It was like gray and red. |
| Hill: | Oh, OK. It was still reddish, but it was graying. And you say he wore glasses. |

-9-

| | |
|---|---|
| Lepinay: | He had on glasses. |
| Hill: | Like reading glasses or sunglasses? |
| Lepinay: | I … |
| Hill: | Could you see through them? |
| Lepinay: | You could see through them. |
| Hill: | Could you see his eyes? |
| Lepinay: | They could be like … glasses you see when you go to the gun range. I, you know. |
| Hill: | And how many times did he strike you in the stomach, with the rifle? |
| Lepinay: | One time. |
| Hill: | Just one. |
| Lepinay: | I will say that. Just one time. |
| Hill: | I'm, assuming you fall down. |
| Lepinay: | Right. |
| Hill: | I understand. He hit you in your stomach. So you go down and you fall to your stomach? |
| Lepinay: | I fall straight. |
| Hill: | Straight down in your stomach. |
| Lepinay: | Right, but my hands … |
| Hill: | Your hands are still in your pockets. So now you're laying on top of your hands. So they are still commanding you to get your hands out of your pockets. And now another officer … |
| Lepinay: | He kneeing me in my back. |
| Hill: | And he's bending down over you? |
| Lepinay: | He's like … wrestling moves. Like he's staying here way up. And drop both your knees in your back. The first time he did it, he was standing straight up, when he dropped both knees in my back. |
| Hill: | So he was actually standing up and dropping back down? |
| Lepinay: | And putting his knees in my back. |
| Hill: | How many times did he do it? |

**Plaintiff's Exhibit 1**

| | |
|---|---|
| Lepinay: | Oh, man, about 3-4 times. |
| Hill: | OK. Can you give me a description of that particular officer? |
| Lepinay: | Blue jeans, that's it. |
| Hill: | But was he male? White? |
| Lepinay: | He was male. |
| Hill: | OK. But you don't recall if he was … |
| Lepinay: | He was white. |
| Hill: | White or Hiapanic? |
| Lepinay: | That, I couldn't … |
| Hill: | OK. But he wasn't black? |
| Lepinay: | He wasn't black. I know black and white, yeah. |
| Hill: | And so, he had on plain clothes as well. Was there anything else distinguished about him? His hair, glasses tattoos … |
| Lepinay: | No. Not that I could see. |
| Hill: | OK. And so, the third officer. After the officer kneed you, it's another officer that you said hit you in the face? All of this is going on simultaneously at the same time? |
| Lepinay: | Yes, yes. |
| Hill: | OK. So the officer that hit you in the face, when did that occur? You're down, the officer, is on … |
| Lepinay: | I'm down. I'm on the floor. |
| Hill: | He's hitting you, saying get your hands out of your pocket. |
| Lepinay: | He's steady hitting me. |
| Hill: | OK, and again you can't get your hands out of your pocket because you land on top of your hands, which the officers also land on top of your back. Correct? |
| Lepinay: | Right. |
| Hill. | OK, so what, can you give a description of that particular officer who hit you in the face? |
| Lepinay: | Black gloves. |
| Hill: | But you didn't see his face? |

| | |
|---|---|
| Lepinay: | I didn't see his face at all. |
| Hill: | So because you could only see that he had on black gloves? OK. But there were multiple offices on the scene, correct? |
| Lepinay: | Right, after I got up and was able to… |
| Hill: | And were they of all races? Black, white, Hispanic? Was there … |
| Lepinay: | Right. |
| Hill: | … any females? |
| Lepinay: | It was when they brought us outside and they called a meat wagon, like they were going to take us to Jail. But really it was to bring the dog in. There were two female officers out here. Both of them were black, I think. One was light-skinned, one was dark skinned. I only seen two lady police officers. |
| Hill: | But you only seen two females outside? |
| Lepinay: | Right. |
| Hill: | OK. And if you had to identify any of these officers, it would, do you, do you think you can identify if you saw photos of them. |
| Lepinay: | Probably. It happened so fast. If I heard their voices, I know I could. |
| Hill: | OK. All right. We went over, you had something in your hand. |
| Lepinay: | I had [unintelligible]. |
| Hill: | But you were not arrested, but they did confiscate it from you. |
| Lepinay: | Uh, hum. Am I going to go to jail now? |
| Hill: | No. No we're, we're not police officers, we're not going to investigate no criminal activity. We are here for purposes of investigating your complaint. |
| Lepinay: | As you see my, the inside of my front door, still. He might have hit it with the ram because the door knob comes off now, but … |
| Hill: | Oh, OK. |
| Lepinay: | I opened the door. And I said "Hold it." And they were hitting on my door as if they were crazy. |
| Hill: | You were probably opening the door just as soon as they were trying to breach the door? |
| Lepinay: | Yeah. |

-12-

**Plaintiff's Exhibit 1**                                                    **Page 12**

| | |
|---|---|
| Hill: | But the breach kind of got interrupted when you opened the door. |
| Lepinay: | Opened the door, yeah. |
| Hill: | OK, so you say they searched the room, they got a lady out the room – that's a female who lives, who resides in the apartment? |
| Lepinay: | Right. Right. |
| Hill: | And just for record, you did tell me on the phone that you rent, that you guys like all rent a room. Is it something like a boarding home or something like that? |
| Lepinay: | Right. |
| Hill: | OK, so the female that was there. Can you give me her name? |
| Lepinay: | I got to give you her name. OK we call her Chocolate. Her name is Rosa Eison, I think it is. I got some mail in there for her now. |
| Hill: | So Rosa Eison was there at the time and she came out of the room? When they brought her out of the room … |
| Lepinay: | They automatically handcuffed her. |
| Hill: | So they handcuffed everyone? |
| Lepinay: | Everybody was handcuffed. |
| Hill: | There was third person in there. Who was that third person? |
| Lepinay: | That was in the back. From out the back. |
| Hill: | Do you know his name? |
| Lepinay: | He stayed there. That was Sinny. |
| Hill: | The guy, I think you gave me his name. Sinqua? |
| Lepinay: | Everybody is looking for me, they don't look in the car. |
| Hill: | OK. What is Sinqua's last name? |
| Lepinay: | I don't know his last name. |
| Hill: | I think somebody gave it to me. I think I have it somewhere. |
| Lepinay: | I think I gave it to you. But I. We had a time spelling it. Childress. |
| Hill: | Childress. Sinqua Childress. So he was also in the house. |
| Lepinay: | Right. |
| Hill: | OK. And you said, I guess you do or don't remember, [unintelligible]. If they had to go get the female out of the bedroom, how was |

**Plaintiff's Exhibit 1**                                                    **Page 13**

| | |
|---|---|
| | she able to see what occurred when all this was happening in the living room? |
| Lepinay: | I'm on the floor. When I get up, she was standing there. So, I don't … |
| Hill: | So you just assuming it went and got her out the room? |
| Lepinay: | Right. Right. |
| Hill: | And when you looked up, she was already there. |
| Lepinay: | Yeah. My back was to, to that way. I was facing east. I would have been facing east. |
| Hill: | All you know is you looked up and she was there. |
| Lepinay: | She was there. Right. |
| Hill: | OK. But according to you, she and Sinqua say that they witnessed the physical contact between you and the officers. |
| Lepinay: | Right. Right. |
| Hill: | OK. At any point in time would you describe yourself as being non-compliant with …? Were you following verbal command outside of the fact of them telling you to get your hands out your pockets. Were you complying? |
| Lepinay: | Yeah. Oh I turned phone off. |
| Hill: | Basically, the police continued the search and they left. |
| Lepinay: | Yeah. |
| Hill: | OK. |
| Lepinay: | They called the paddy wagon that they were going to take us to jail. |
| Hill: | Did they interview any of you guys in the house? |
| Lepinay: | Yeah, I guess you could say they interviewed. Yeah. |
| Hill: | And warrant was, for you say, James Davis. James Davis, I assume, this is the fourth person that resides, but he wasn't home at the time. |
| Lepinay: | But he wasn't home at the time |
| Hill: | The issue about the warrant is not up for question. It was valid warrant. That person did is here. OK, so that's not the issue. The issue is the physical part. |

-14-

| | |
|---|---|
| Lepinay: | The physical part, yeah. They didn't have to do that. |
| Hill: | OK. Mr. Neal, do you have any questions? |
| Neil: | The only thing, I just want to elaborate on. You say the officer struck you on face. |
| Lepinay: | Yeah when I couldn't see. That's when I'm turned this way, like I'm, looking at you right, but I'm laying on stomach and he's punching. |
| Neil: | Punching on the face? |
| Lepinay: | In this area. Right here. |
| Neil: | On the side of the face? |
| Lepinay: | Yeah, it got to be. Yeah. |
| Neil: | OK. How many times did he punch you? |
| Lepinay: | I couldn't tell you. It was multiple times. |
| Neil: | Did you sustain any the injuries from this? |
| Lepinay: | I think I feel a knot, I do feel it, I feel like a knot here. |
| Neil: | But there was like no massive scar? |
| Lepinay: | No. It didn't swell up. It was like he hit me right up by the temple, you know what I'm saying? That's basically where he hit me at. Where it's bony at and you really can't see the marks, it wouldn't bruised that easy. |
| Neil: | OK. So you had slight swelling right there. Any other injuries? |
| Lepinay: | From them kneeing in my back … it might be because I go to Chemo Monday the 31st. I just been home four minutes. And I've been in the hospital for a week. I didn't feel like rushing back to a hospital. I just got home after a week. Think about it. Would you rush back? |
| Neil: | I just wanted to make sure we cover everything. OK. That's all the questions I have. |
| Hill: | You were in the hospital, you just stated you were in the hospital for a week prior and you had just returned. |
| Lepinay: | Right. |
| Hill: | And you were at Jackson Park? |
| Lepinay: | Yes m'am. |
| Hill: | And then you said the nurse arrived you said the nurse arrived. |

**Plaintiff's Exhibit 1**                                                      **Page 15**

|  | |
|---|---|
|  | OK, you showing me now, and I'm going to say for the record. You still have the medical band on from Jackson Park, dated 10/14/2016, 15:32 hours. So you had been initially, went to the hospital, admitted October 14th, Wednesday night, and you had just been released October 21st. |
| Lepinay: | Yeah. |
| Hill: | OK, somewhere prior to noon. |
| Lepinay: | On the 21st ... from Friday to Friday. |
| Hill: | OK. I do have one more question. You stated a nurse had arrived during an incident. But did she ever come in? |
| Lepinay: | No. When she seen all of that she kept going.<br><br>She talked to one of the officers. Talked to her. That's when I saw the black officer. That's when he came in and he had talked to her and he went straight to the dining room table. |
| Hill: | She got out the car? |
| Lepinay: | No, he went to her car. I heard he walked to her car. |
| Hill: | And you can hear all that? |
| Lepinay: | I couldn't hear that. I'm telling you I just talked to her last night. |
| Hill: | Oh, she told you this? |
| Lepinay: | Right. What would you call that, hearsay? |
| Hill: | Do you have her name? |
| Lepinay: | Yeah. Brenda Digby. |
| Hill: | Brenda Digby. And is she a nurse from Jackson Park? |
| Lepinay: | No. No. Private. A friend and a nurse I know. Yeah. |
| Hill: | OK. Do you happen to have her contact number? |
| Lepinay: | Not right off hand, no. |
| Hill: | OK, but if you can get it ... |
| Lepinay: | I can get to it. |
| Hill: | OK. All right. I have no further questions. I would like to just do some preliminary that I should have did before.<br>The statement that you just provided you did provide of your own free will? Is that correct? |
| Lepinay: | Yes. |

**Plaintiff's Exhibit 1**                                              **Page 16**

| | |
|---|---|
| Hill: | And your account to everything that you just stated before, is that a true and accurate account of what occurred? |
| Lepinay: | Yes. That's how it happened. To the best of my recollection. |
| Hill: | OK. This now concludes the audio recorded statement of Mr. Andre Lepinay relative to log number 1082761. The time is currently 11:55 a.m. |
| Lepinay: | I forgot. I had … [recording ends] |

-17-

**Exhibit 2**

# INDEPENDENT POLICE REVIEW AUTHORITY
## CITY OF CHICAGO

## CONSENT TO RECORD INTERVIEW

Date: 28 Oct 16                    Location: 7428 S. Coles

I, Andre Lepinay
(Name)

hereby authorize investigator(s) Hill #172 /Neal #131
List name(s) of investigators

from the Independent Police Review Authority to record our interview on

28 Oct. 16
Date                    at 11:20 a.m./p.m.
Time      (circle)

I understand that I am not required to consent to such recording, and I have given permission to the above-named investigator(s) freely and voluntarily and without threats of promises of any kind.

Andre Lepinay
Signature

Witness

Witness

Revised: 23-Mar-16

**Plaintiff's Exhibit 2**

ALEPINAY 0007
Page 1

**Exhibit 3**

# SWORN AFFIDAVIT – ELECTRONICALLY RECORDED STATEMENT

| Location of Incident: 7428. S. Coles | Date: 21 Oct 16 | Time: 1200 |
|---|---|---|

Summary of Statement(s):

See Audio Recorded Statement

I, Andre Lepinay _____, have given an electronically recorded statement related to the above-referenced incident. I swear or affirm, under penalties provided by law, that the information contained in the above and/or attached statement summary, or the attached electronically recorded statement, is true and accurate.

X Andre Lepinay
(Signature of person making statement)

Andre Lepinay
(Print name)

28 Oct 16
(Date)

State of Illinois
County of Cook

OFFICIAL SEAL
CHANTELLE HILL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/25/18

(Notary Public)                    (Verifies Via I.D)

(Deputy Clerk)

Signed and sworn before me on this

28th day of Oct , 20 16

(Print name)

(Date)

Attachment No._____

Complaint Log No. _____

Created 4-5-11

**Plaintiff's Exhibit 3**